# Order

**Michigan Supreme Court**
**Lansing, Michigan**

November 16, 2018

Stephen J. Markman,
Chief Justice

Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement,
Justices

156223

PEOPLE OF THE STATE OF MICHIGAN,
       Plaintiff-Appellant,

v

BRIAN KEITH ROBERTS,
       Defendant-Appellee.

SC: 156223
COA: 327296
Kalamazoo CC: 2014-000714-FC

_____/

On October 9, 2018, the Court heard oral argument on the application for leave to appeal the June 6, 2017 judgment of the Court of Appeals. On order of the Court, the application is again considered, and it is DENIED, because we are not persuaded that the question presented should be reviewed by this Court.

MARKMAN, C.J. (*dissenting*)

I respectfully dissent from this Court's order denying leave to appeal. Defendant argues that defense counsel performed deficiently because he did not present expert testimony to counter that presented by the prosecutor concerning the two-year-old victim's abusive head trauma (AHT) and that this deficiency was prejudicial to his defense, resulting in the ineffective assistance of counsel. For the reasons set forth in Justice ZAHRA's dissent, I disagree that defense counsel performed deficiently and write separately to assert that defendant is not entitled to a new trial for the additional reason that he has failed to show prejudice.[1]

---

[1] " 'To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy the two-part test articulated by the United States Supreme Court in [*Strickland v Washington*, 466 US 668 (1984)].' " *People v Dendel*, 481 Mich 114, 124-125 (2008), amended 481 Mich 1201 (2008), quoting *People v Carbin*, 463 Mich 590, 600 (2001). "First, the defendant must show that counsel's performance was deficient." *Dendel*, 481 Mich at 125 (quotation marks and citations omitted). "Second, the

" 'To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.' " *People v Dendel*, 481 Mich 114, 125 (2008), amended 481 Mich 1201 (2008), quoting *People v Carbin*, 463 Mich 590, 600 (2001). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Dendel*, 481 Mich at 125, quoting *Strickland v Washington*, 466 US 668, 694 (1984). "*Strickland* asks whether it is 'reasonably likely' the result would have been different." *Harrington v Richter*, 562 US 86, 111 (2011), quoting *Strickland*, 466 US at 696. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.' " *Id*. at 111-112, quoting *Strickland*, 466 US at 693, 697.

At trial, defense counsel asserted that defendant accidentally caused the fatal injuries by pulling the child's ankles when the child was standing, which resulted in the child losing his balance and striking his head on the floor. In contrast, the prosecutor asserted that defendant intentionally caused the injuries by handling the child violently--either by shaking the child or causing his head to forcefully strike the floor, or both. Thus, because the parties did not dispute that defendant caused the injuries, the critical factual dispute at trial concerned whether he possessed the requisite intent for the charges of second-degree murder and felony murder with the predicate felony of first-degree child abuse. "The intent necessary for second-degree murder is the intent to kill, the *intent to inflict great bodily harm*, or the willful and wanton disregard for whether death will result." *People v Robinson*, 475 Mich 1, 14 (2006). "[T]o be convicted of first-degree child abuse, a person [must have] 'knowingly or intentionally cause[d] serious physical harm or serious mental harm to a child.' " *People v Maynor*, 470 Mich 289, 295 (2004). First-degree child abuse may be the predicate felony for felony murder. See *id*. at 293.

Defendant cannot show prejudice because there existed strong evidence that he possessed the requisite intent for second-degree murder and felony murder with the predicate felony of first-degree child abuse, thus sustaining the jury's verdicts for those offenses.[2]

---

defendant must show that the deficient performance prejudiced the defense." *Id*. (quotation marks and citations omitted).

[2] The Court of Appeals correctly noted that "[i]t is a violation of double jeopardy to convict someone of multiple murder counts arising from the death of a single murder victim," *People v Roberts*, unpublished opinion per curiam of the Court of Appeals, issued June 6, 2017 (Docket No. 327296), p 1 n 1, so the second-degree murder conviction should be vacated here.

First, defendant altered his story about the fatal injuries multiple times. He initially told the detective that he had witnessed the child falling down the stairs, and then he told the detective that he had not witnessed the child falling down the stairs and only assumed that such a fall had occurred because he heard a thumping sound. Thereafter, following his arrest a few months after the fatal incident, he told the detective that he had caused the fatal injuries by pulling the child's ankles, intending that the child land on his butt but instead causing the child to lose his balance and strike his head on the floor. In my judgment, these conflicting statements go beyond innocent lapses of memory and reflect a desire to conceal incriminating facts from law enforcement. That is, defendant's inability consistently to reiterate two critical facts surrounding the fatal incident-- whether he saw them occur or caused them to occur, or both-- is affirmatively indicative of guilt. See *People v Unger*, 278 Mich App 210, 225-226 (2008), quoting *People v Cowell*, 44 Mich App 623, 625 (1973) (" '[C]onflicting statements tend to show a consciousness of guilt . . . .' ").

Second, a witness testified that in November 2013, about one month before the fatal incident, she heard defendant tell the child, "[S]it your bitch ass down for [sic] you get fucked up. I'm about to beat your ass if you don't sit down." Defendant's conduct was so shocking to her that when she learned about the child's death, she went "downtown" to share her information with the police because she believed that she "coulda prevent[ed] this from happening if [she] woulda just said something then . . . ." Such threatening statements to the child tend to show guilt in this child-abuse case. See *People v VanderVliet*, 444 Mich 52, 81 n 37 (1993), quoting Imwinkelried, Uncharged Misconduct Evidence, § 5:10, p 26 ("The courts often admit uncharged misconduct in child abuse cases when the defendant claims that he or she accidentally injured the child. . . . If the defendant claims that she intended to merely discipline her child, evidence of uncharged misconduct may be admissible to establish the defendant's intent to injure the child.").

Third, there was general agreement among the doctors who testified at trial-- and at the *Ginther*[3] hearing as well-- that the child had suffered two "subdural hemorrhages," which are essentially internal injuries adjacent to the brain.[4] One subdural hemorrhage

---

[3] *People v Ginther*, 390 Mich 436 (1973).

[4] As a neuropathologist explained at trial:

> [T]here are actually veins that cover the surface of the brain. . . . And so you have these veins that basically sit out here between the dura on the top and the brain underneath . . . . And often with impact, literature says it doesn't have to be impact, but often with impact, you'll have rupture of these veins that sit on the surface of the brain. And the rupture of those veins are what results in this hemorrhage over the surface of the brain that

was apparently suffered weeks before the fatal incident, and the second subdural hemorrhage was suffered as part of the fatal incident. There was also general agreement that subdural hemorrhages are caused by the application of force to the head. Importantly, the child was in defendant's custody for most of time during which the weeks-old subdural hemorrhage could have occurred. Perhaps one subdural hemorrhage, by itself, could have been caused by an accidental fall, as defendant's experts at the *Ginther* hearing testified. However, logic would suggest that *two* subdural hemorrhages indicated either a notable coincidence or, more likely given the other evidence, a pattern of abuse by defendant.

The incriminating evidence cited above was in addition to the opinion testimony from prosecutor's experts that the fatal injuries suffered by the child were indicative of intentionally inflicted abuse. And as the trial court stated in its opinion and order denying the motion for a new trial, defendant's experts only testified at the *Ginther* hearing that defendant's innocent explanation for the fatal injuries was "a possibility." It strikes me as unwarranted to grant defendant a new trial on the basis of such vague and tentative assertions.[5] Anything is "possible"; it is only by engaging in a reasoned process of elimination of one or more alternative possibilities that a jury is able to find guilt beyond a reasonable doubt when a defendant offers an innocent explanation for allegedly criminal conduct. Here, even if the experts offered by defendant at the *Ginther* hearing had testified at trial and the jury had found them credible, the jury would have been left with weighing the "possibility" that there was an innocent explanation for the fatal injuries against the prosecutor's substantial evidence that those injuries had been intentionally inflicted, in addition to the contrary nonexpert testimony. On this record, I discern no basis for concluding that it is "reasonably likely" that the allegedly deficient performance by defense counsel, i.e., the failure to present such testimony from the two *Ginther* hearing experts at trial, was prejudicial to defendant.

Accordingly, I conclude that defendant failed to show prejudice because the circumstantial evidence that he possessed the requisite criminal intent for the charges of which he was convicted was substantial. Thus, for the reasons both set forth above and in Justice ZAHRA's dissent, I believe that the trial court did not err by denying defendant's

---

we call subdural. And that's basically the accepted mechanism for subdural hemorrhage.

[5] Indeed, this testimony was not as helpful as the testimony offered at the *Ginther* hearing recently assessed in *People v Ackley*, 497 Mich 381 (2015), in which we concluded that the defendant was entitled to a new trial because he was denied the effective assistance of counsel by counsel's failure altogether to secure expert testimony concerning AHT. In *Ackley*, the favorable assertion offered by the defendant's expert after trial was that the head injuries "were caused by a *likely* accidental 'mild impact.' " *Id*. at 387 (emphasis added).

motion for a new trial and that the Court of Appeals erred by ruling to the contrary. Consequently, I would reverse the judgment of the Court of Appeals and reinstate the trial court's order denying defendant's motion for a new trial.

WILDER, J., joins the statement of MARKMAN, C.J.

ZAHRA, J. (*dissenting*)

I respectfully dissent from the Court's decision to deny the prosecution's application. In my view the Court of Appeals failed to provide the trial court's findings any measure of deference and improperly relied on this Court's decision in *People v Ackley*.[6] Unlike this Court's decision in *Ackley*, where the expert himself expressly informed defense counsel that " 'you don't want me as your defense expert,' "[7] or *Hinton v Alabama*, where defense counsel himself deemed an expert inadequate,[8] or *Ceasor v Ocwieja*, where defense counsel wanted to call an expert at trial but failed to petition the court for fees,[9] there is no indication that defense counsel believed Dr. Stephen Guertin to be unduly biased, inadequate, or unavailable. In fact, all indications suggest the opposite.[10] The United States Supreme Court has made clear that

---

[6] *People v Ackley*, 497 Mich 381 (2015).

[7] *Id*. at 386.

[8] *Hinton v Alabama*, 571 US 263, 275 (2014) (holding that "the unreasonable failure to understand the resources that state law made available to [defense counsel]—that caused counsel to employ an expert that *he himself* deemed inadequate"—was an "inexcusable mistake of law").

[9] *Ceasor v Ocwieja*, 655 Fed Appx 263, 273, 285 (2018).

[10] Defendant's new assertion that Dr. Guertin was "unqualified" to render an opinion on child abuse strains common sense. Indeed, the Court of Appeals properly rejected this very claim in *People v Ackley*, unpublished per curiam opinion of the Court of Appeals, issued August 2, 2018 (Docket No. 336063), p 4, lv pending (Docket No. 158455):

> As an initial matter, while Dr. Guertin was not a forensic pathologist, it defies sense to conclude that a doctor with extensive experience treating trauma victims would lack insight into what kinds of traumas tend to lead to what kinds of injuries. Expertise in pediatric intensive care inescapably has considerable crossover into the medical treatment portion of expertise in child abuse. Dr. Guertin was the Director of the Children's Center at Sparrow Hospital, Director of the Pediatric Intensive Care Unit, and a physician member of [the] Child Safety Program. He is also a member of two Child Death Review teams from both

ᵉ

the inadequate assistance of counsel . . . does not consist of the hiring of an expert who, though qualified, was not qualified enough. The selection of an expert witness is a paradigmatic example of the type of "strategic choic[e]" that, when made "after thorough investigation of [the] law and facts," is "virtually unchallengeable." We do not today launch federal courts into examination of the relative qualifications of experts hired and experts that *might* have been hired.[11]

Here, the trial court found that during

discussions with Dr. Guertin, [defense counsel] weighed the advantage of presenting the expert pediatrician, who apparently would have given testimony that the fatal injuries Nehemiah suffered could have been accidental, against further testimony that may have revealed that Nehemiah had otherwise suffered physical abuse in other areas of his body. In balancing the impact of each, trial counsel concluded that it would be sagacious to avoid the topic of possible other physical abuse altogether in favor of obtaining at least the minimal concession from one or more of the government's witnesses that an accident might have caused the injuries.

The Court of Appeals' opinion does not mention any of the above facts the trial court relied upon to evaluate defense counsel's performance. Rather, the panel substituted its own judgement and found that "[defense counsel] did not demonstrate sufficient understanding of the pertinent medical controversy concerning the amount of

---

Eaton and Ingham County for almost twenty years. He sees about two hundred to two hundred fifty children a year who are referred because of the possibility of abuse or neglect, and he is a practicing physician who sees actual patients. He testified that he attended autopsies and performed death reviews. Clearly, Dr. Guertin did not need to be qualified as an expert in child abuse to be able to render expert testimony concerning the genesis of certain injuries.

While I normally would not cite a case currently pending review from this Court, defendant Ackley does not challenge Dr. Guertin's qualifications in his application to this Court.

[11] *Hinton*, 571 US at 274-275 (citation omitted; emphasis added).

force required to inflict the type of injuries involved to legitimize his decision not to attempt to secure expert testimony in support of the defense theory."[12]  Thus, the panel not only failed to review for clear error the trial court's findings of fact, but also failed to appreciate that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ."[13]  Indeed, as explained in *Strickland v Washington*, "[t]hese standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case."[14]

MARKMAN, C.J., and WILDER, J., join the statement of ZAHRA, J.

---

[12] *People v Roberts*, unpublished per curiam opinion of the Court of Appeals, issued June 6, 2017 (Docket No. 327296), p 9.

[13] *Strickland v Washington*, 466 US 668, 689 (1984).

[14] *Id*. at 690.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

November 16, 2018



s1113

Clerk